**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANGEL LUIS GARCIA,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **PRIMECARE MEDICAL, INC., et al.,** | : | **NO. 08-3589** |
| **Defendants.** | : | |

**M E M O R A N D U M**

**GENE E.K. PRATTER, J.,**                                                **AUGUST 27, 2012**

**I.     INTRODUCTION**

        Litigation often prompts the saying that "justice delayed is justice denied."  This case, however, concerns delayed medical care for an inmate in the county prison facility and the question of who may be responsible for subsequent claims.

        Plaintiff Angel Luis Garcia brings this action against Defendants Berks County Prison Correctional Officers Michael R. Buffington, Miguel A. Castro, Seth A. Jefferson, Ryan C. Kern, and Larry V. Schell (collectively, the "Berks Officers"), and PrimeCare Medical, Inc. ("PrimeCare"), PrimeCare Medical, Inc. Healthcare Providers John Does 1-10,[1] and John Doe,

_____

        [1] The "John Doe" defendants have been on the docket since January 30, 2009, well over three (3) years, without being identified.  No one has made an appearance on behalf of the John Doe defendants, and neither of the motions were filed on behalf of John Does.  The Court notes that Federal Rule of Civil Procedure 21 provides that "on motion or on its own, the court may at any time, on just terms, add or drop a party."  Fed. R. Civ. P. 21. As the Third Circuit Court of Appeals has observed, "[u]se of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified . . . . [I]f reasonable discovery does not unveil the proper identities, however, the John Doe defendants must be dismissed." Blakeslee v. Clinton Cty., 336 F. App'x 248, 250 (3d Cir. 2009) (citations omitted); see also Scheetz v. Morning Call, Inc., 130 F.R.D. 34, 37 (E.D. Pa.1990) ("Fictitious parties must

Berks County Prison PrimeCare Medical Supervisor Administrator.  Mr. Garcia asserts a claim

under 42 U.S.C. § 1983 against all of the defendants for their allegedly deliberately indifferent

refusal or failure to provide him with adequate medical care in violation of his Fourteenth

Amendment Due Process rights.  He also asserts a variety of state law negligence claims against

PrimeCare.

The Berks Officers and PrimeCare filed separate motions for summary judgment.  For the

reasons that follow, the Court grants the Berks Officers' motion, and denies PrimeCare's motion.


## II.    FACTUAL BACKGROUND

### A.  Mr. Garcia's Head Injury, Treatment, and Suture Removal

In the early morning hours of August 6, 2006, a crowd gathered at the site of a

disturbance near 8th and Walnut Streets in Reading, Pennsylvania.  See Pl.'s Counterstatement of

Material Facts in Resp. to Def. Berks S.J. Mot. ("PCMF-B") ¶ 1.  Amid the commotion, a man

named Cletus Rivera (who is not a party to this lawsuit) shot and killed Reading Police Officer

Scott Wertz, the officer who responded to the initial disturbance.  See id. ¶ 2.  After Officer

Wertz was shot, various members of the Reading Police Department attempted to disperse the

crowd.  See id. ¶ 3.  While attempting to control the crowd, the police officers arrested Mr.

Garcia.  See id. ¶ 4.  In an effort to subdue Mr. Garcia and effectuate his arrest, one of the

officers cut Mr. Garcia on the back of his head after striking him with a flashlight.  See id. ¶ 5;

---

eventually be dismissed . . . if discovery yields no identities.").  Although no trial will proceed
against "John Doe" defendants, the Court declines to dismiss the John Doe defendants at this
time.

Garcia Dep. 36-37.  The police took Mr. Garcia to Reading Hospital, where doctors treated his head wound with sutures.  See PCMF-B ¶¶ 6-8.

The treating physicians at Reading Hospital issued written instructions that Mr. Garcia would need to have his sutures removed within 10 days, i.e., by August 16, 2006.  See PCMF-B ¶¶ 10-11, Exs. D, E, I.  Reading Hospital also completed an "injured or sick prisoner report," including the same instruction for suture removal.  See id.[2]  Upon Mr. Garcia's arrival at Berks County Prison on the morning of August 6, 2006, Reading Hospital's instructions for suture removal were received by both Berks County Prison and PrimeCare.  See id. ¶ 12.  The instructions were then incorporated into Mr. Garcia's medical records and prison file.  See id.

Despite these instructions, the sutures remained in Mr. Garcia's head four more months, until December 5, 2006, when a PrimeCare certified physician's assistant named Jesse Kirsch removed them.  See id. ¶ 22.  Due to the delay in removing the sutures, Mr. Garcia alleges that he has suffered headaches and an infection,[3] and that he was left with an approximately one-half inch area of exacerbated scarring around the sutures site.  See id. ¶¶ 24-25; Garcia Dep. 95, 97-98, 101-02, 105, 131-33, 152-53.

---

[2] The facts surrounding Mr. Garcia's arrest, receipt of sutures, and projected date of suture removal are uncontested and are identical as to all defendants.

[3] A dispute of fact exists as to whether Mr. Garcia suffered an infection due to the delayed suture removal.  Mr. Garcia's claim of infection is directly contested by the deposition testimony of Mr. Kirsch, who removed Mr. Garcia's sutures on December 5, 2006.  Mr. Kirsch testified that he noted the presence of a scar but did not note any signs of infection.  See Kirsch Dep. 195-96.  In any event, the parties do not dispute Mr. Garcia's claims of headaches, or the existence of a scar, although the Berks Officers contend Mr. Garcia's headaches predated his injury on August 6, 2006 and that there is no testimony from Mr. Garcia or others that headaches were attributable to the sutures.  See Def. Berks Stmt. of Undisputed Facts in Sup. of S.J. Mot. ¶ 25.

**B.      The Berks Officers' Treatment of Mr. Garcia**

Generally, in the Berks County penal facility, all inmate medical concerns must be submitted to PrimeCare on a written sick call form.  See Castro Dep. 29-30.  Although inmates can seek medical attention through a variety of ways, sick call forms are the primary means through which inmates schedule medical appointments with PrimeCare.  See id.

Berks County Prison Correctional Officer Miguel Castro testified that throughout Mr. Garcia's various cell assignments, sick call forms were located at the officer's station.  See id. To retrieve a sick call form from the officer's station, an inmate must request the form from the Correctional Officers on duty.  See id.  After completing a sick call form, the inmate must either request that a Correctional Officer collect the form or place the form in a collection bin during recreation when inmates are allowed outside of their cells.  See id.  Outside of the sick call procedure, Officer Castro testified that Correctional Officers are not required to report medical complaints to PrimeCare, with the exception of "medical emergenc[ies]."  See id.

Five of the Berks Officers testified at their depositions that they could recall nothing about Mr. Garcia or his verbal requests for medical attention, with only one officer remembering having seen Mr. Garcia in the medical quarantine unit upon his arrival.  Def. Berks Mem. of Law

4

in Supp. of S.J. Mot. at 10.[4]  Mr. Garcia alone testified to the following conduct in support of his

claim that Berks denied him access to medical care:[5]

- Mr. Garcia testified that Correctional Officer Buffington interacted with him while he was in the holding area prior to entering the general prison population: "[I] kept asking [Buffington] to call the nurse."  <u>See</u> PCMF-B ¶ 16; Garcia Dep. 93.  Officer Buffington allegedly responded that "he'll get to it."  <u>Id</u>.  Mr. Garcia testified that a nurse never arrived.  <u>See id</u>.

- Mr. Garcia testified that Lieutenant Castro also interacted with Mr. Garcia while he was in the holding area: "[I] actually complained to [Lieutenant Castro] more than six times."  <u>See</u> PCMF-B ¶ 17; Garcia Dep. 92-93.  Lieutenant Castro allegedly responded that "[he's] got nothing to do with that."  <u>See id</u>.

- Mr. Garcia testified that Correctional Officer Hitchens interacted with him when he was in the holding area: "[I] said to [Hitchens] that I need medical attention . . . . I told [Hitchens] that I have headaches."  <u>See</u> PCMF-B ¶ 18; Garcia Dep. at 95-97.  Officer Hitchens allegedly responded by saying "the nurse is out."  <u>Id</u>.  At his deposition, Mr. Garcia stated that he "guess[ed Hitchens] got agitated after I kept asking him to call the nurse for my head injury because it was starting to hurt.  I was getting headaches.  He came up and yelled at me, told me to shut the [expletive] up . . . I kept yelling for a lieutenant . . . ."  <u>See id</u>.

- Mr. Garcia testified that Correctional Officer Jefferson interacted with him while he was in the protective custody area: "[J]efferson came, and they cell-searched my cell . . . .  I went asking him to help me . . . [and he] didn't say nothing.  He just stood there like I wasn't even there."  <u>See</u> PCMF-B ¶ 19; Garcia Dep. 97-99.

- Mr. Garcia testified that Correctional Officer Kern interacted with him after he received his stitches: "[I] went asking him for medical help" on two separate occasions, and "showed him my stitches."  <u>See</u> PCMF-B ¶ 20; Garcia Dep. 100-

---

[4] <u>See</u> Buffington Dep. 51-52 (unable to recall Mr. Garcia's injuries or any conversations he had with Mr. Garcia), Schell Dep. 55 (recalling Mr. Garcia had his head bandaged, but not recalling any interactions between Mr. Garcia or with the medical personnel), Jefferson Dep. 58 (unable to recall conversations with Mr. Garcia about medication, but recalling his head was bandaged when he was in quarantine), Kern Dep. 32 (unable to recall any interaction with Mr. Garcia).

[5] The exact dates of the alleged interactions between the named Correctional Officers and Mr. Garcia are uncertain.

03.  Mr. Garcia testified that Officer Kern replied he would call a nurse, but no nurse ever came.  See PCMF-B ¶ 20; Garcia Dep. 101-103.  Mr. Garcia also alleges that Officer Kern is a "racist" who wore a shirt which stated "Fry Cletus."[6] Garcia Dep. 102-03.

•    Mr. Garcia testified that Correctional Officer Schell interacted with him after he received his stitches: when opening the cell doors for dinner, Mr. Garcia "went straight to pill line to talk to the nurse about [his] injuries."  See PCMF-B ¶ 21; Garcia Dep. 103-05.  He stated, "[A]s I went to show [the nurse] my stitches, Schell jumped out of his seat and started screaming at me . . . ."  Id.

In the event that a prisoner believes that his medical treatment was inadequate, or objects to an aspect of his imprisonment, the Berks County Prison Inmate Handbook lays out a multi-tier system whereby the inmate may seek formal review of his complaint.  This handbook is provided to every inmate upon his arrival.  The written policy indicates that, "most routine housing unit and treatment matters or questions can be handled by speaking with the housing unit officer or treatment staff."  Pl. Ex. M at 31.  An inmate can also "submit a written request (using an Inmate Communication Form) to staff other than those assigned to work directly in your housing unit.  A "Request Box" is provided for this purpose on each housing unit."  Id.  In the event that "a significant complaint has not been resolved by this process," an inmate may file a grievance.  Id. Grievance forms may be requested from housing unit officers.  Id. at 32.  Multiple Berks Officers, however, testified that a complaint is equally valid if voiced via an inmate communication form as a grievance form.  See Castro Dep. 41-42; Hitchens Dep. 34-36, 79-80.

_____

[6] "Fry Cletus" is supposedly a reference to Cletus Rivera, who shot and killed Officer Wertz on August 6, 2006.  In his initial, *pro se* Complaint, Mr. Garcia specifically alleged that the then unnamed Berks Officers denied him access to medical care because Officer Wertz was a former Correctional Officer in Berks County Prison.  See Docket No. 12, Complaint, in Civil Action No. 07-2066, ¶ 49.  The relationship between Mr. Garcia and Mr. Rivera was alluded to, as both were suspected members of the same "Hudson Street Crew" gang.  In his deposition, Mr. Garcia testified that prison staff and PrimeCare associated the two men, and that this association was the reason Mr. Garcia was denied medical care for his sutures.  Garcia Dep. 63-64.

Mr. Garcia testified that Officers Schell, Kern, and Cooper denied him access to grievance forms, see PCMF-B ¶ 29, that the Berks Officers deliberately denied or ignored his "cries of asking for medical attention" regarding suture removal, and "never" gave him a "sick call form" when he asked for one.  See PCMF-B at ¶ 28; Garcia Dep. 110-13.  However, his medical and prisoner history reflect that between August 6, 2006, and December 5, 2006, Mr. Garcia submitted three sick call forms to PrimeCare as well as fifteen inmate grievance and communication forms to the Berks County Prison, none of which included a complaint regarding sutures, his head, or inadequate medical care.  See PCMF-B Resp. ¶¶ 37-38, 56-57; see also Berks Ex. N.

### C.    PrimeCare's Treatment of Mr. Garcia

PrimeCare Medical, Inc. is a privately-owned corporation that contracts with correctional facilities to provide medical services to their inmates.  See Pl.'s Counterstatement of Material Facts in Resp. to PrimeCare's S.J. Mot.  ("PCMF-P") ¶ 1, Shelton Dep. 22-23.  Upon Mr. Garcia's arrival at the Berks County Prison on August 6, 2006, PrimeCare staff evaluated the discharge instructions and the injured or sick prisoner report prepared by Reading Hospital and included them in Mr. Garcia's medical charts.  See id. ¶ 26.  Mr. Kirsch examined Mr. Garcia on August 8, 2006, noted the sutures on Mr. Garcia's head, and entered a medical order for their removal on August 11, 2006.[7]  See id. ¶¶ 27-32.  He also ordered the dressings on Mr. Garcia's

---

[7] At the top of each patient's file, PrimeCare maintains a "Master Problem List," which highlights any medical problems and whether they have been resolved.  See id. ¶¶ 71-72.  Mr. Kirsch included an instruction on Mr. Garcia's "Master Problem List" to provide suture wound care, which went unnoticed or ignored until December 5, 2006, when he removed Mr. Garcia's sutures.  See id. ¶¶ 73-74.

head to be changed daily for five days.  Id.  Both Doctors Deborah Wilson and Erik Von Kiel

(PrimeCare physicians) reviewed and approved of Mr. Kirsch's examination form.  See id.

It is undisputed that the August 11 follow-up appointment did not occur.  However, the

reason for the missed appointment is less clear.  PrimeCare admits that in 2006, it lacked a

specific protocol for creating, managing, and communicating medical orders such as Mr.

Kirsch's order for suture removal on August 11, 2006.  See PCMF-P ¶¶ 67-70.  Instead,

PrimeCare personnel testified that nurses would transfer orders to a "provider list" or calendar in

an ad hoc manner.  Dr. Von Kiel, the Medical Director of PrimeCare at Berks County Prison,

testified that if an inmate missed an appointment he (Dr. Von Kiel) would normally inquire as to

why the appointment was missed.  See Von Kiel Dep. 185.  However, both Mr. Kirsch and Dr.

Wilson testified that they could not recall any investigations or inquiries regarding why Mr.

Garcia's appointment did not occur on August 11.  Kirsch Dep. 182-183; Wilson Dep. 89.

PrimeCare personnel saw Mr. Garcia multiple times for a variety of unrelated medical

conditions during the relevant period including on August 8, 2006, August 9, 2006, September

20, 2006, October 11, 2006, November 13, 2006, and December 5, 2006.  PrimeCare Ex. B.

Likewise, while Mr. Garcia was relegated to segregated housing, Mr. Garcia was seen by

PrimeCare staff on at least thirty-one (31) separate occasions during segregation rounds.[8]

PrimeCare Ex. F.  Mr. Garcia testified that he informed or attempted to inform PrimeCare

---

[8] Additionally, following the removal of his sutures, PrimeCare personnel saw Mr. Garcia
on January 3, 2007, January 5, 2007, January 12, 2007, February 6, 2007, February 13, 2007, and
March 23, 2007.  PrimeCare Ex. B.

doctors about his latent sutures on multiple occasions.  See Garcia Dep. 130.  On one such

occasion, Mr. Garcia testified that the doctor "kicked [him] out" of his office.[9]

Many doctors employed by PrimeCare at Berks County Prison testified that it is important

to remove sutures on time, and that Mr. Garcia's sutures should have been removed prior to

December 5, 2006.  PCMF-P ¶¶ 45-52.

### D.    Procedural History

Mr. Garcia filed a *pro se* complaint in Civil Action No. 07-2066 on November 19, 2007.

Upon the appointment of counsel, Mr. Garcia withdrew his *pro se* complaint, and filed the

present action on July 31, 2008 naming, among others, Berks County Prison.  See Docket. No. 1

in C.A. No. 08-3589.  On November 14, 2008, Mr. Garcia agreed to dismiss Berks County Prison

in return for a copy of his inmate record and a list of correctional officers employed during the

period of his incarceration from August 2006 to July 2007.  See Docket. Nos. 7, 12.

Shortly thereafter, on January 30, 2009, Mr. Garcia filed a First Amended Complaint

naming seven (7) Correctional Officers in Berks and PrimeCare, and omitting Berks County

Prison.  See Docket. No. 21.  Correctional Officer James H. Cooper died before the filing of the

First Amended Complaint.  The Court dismissed Officer Cooper as a defendant by Stipulation

and Order on May 28, 2009.  See Docket No. 37.  Then, one week before oral argument, Officer

---

[9] Mr. Garcia also testified that his requests for treatment of his headaches went ignored.
See Garcia Dep. 58-59, 105, 118-120, 158-161.  However, dispensary cards that track prisoners'
medications reflect that Mr. Garcia was provided with headache medicine (Motrin) on August 7,
8, 9, September 20, October 11, November 13, and December 5 of 2006.  See PrimeCare Ex. B.

Stephen A. Hitchens was dismissed without prejudice by Stipulation and Order.  See Docket No. 58.  Five named Berks Officers remain as defendants in this case.

## III.   LEGAL STANDARD

Upon motion of a party, summary judgment is appropriate if, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . .  admissions, interrogatory answers, or other materials," the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  FED. R. CIV. P. 56(c); Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution could affect the result of the suit under governing law.  Id.

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.  Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition by "citing to particular parts of materials in the record."  FED. R. CIV. P. 56(c)(1).  "The Court need consider only the cited materials" when determining whether there

exists a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(3).  If the cited evidence is

"merely colorable, or is not significantly probative, summary judgment may be granted."

Anderson, 477 U.S. at 249-50 (citations omitted).  This requirement upholds the "underlying

purpose of summary judgment [which] is to avoid a pointless trial in cases where it is

unnecessary and would only cause delay and expense." Walden v. Saint Gobain Corp., 323 F.

Supp. 2d 637, 641 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573

(3d Cir. 1976)).


IV.     DISCUSSION

        Mr. Garcia brings his federal claim in Count I under 42 U.S.C. § 1983 for alleged

violations of his Fourteenth Amendment right to adequate medical care against both the Berks

Officers and PrimeCare.  Although PrimeCare is also named in Mr. Garcia's various claims

alleging state law negligence, medical malpractice, and vicarious liability in Counts II through

VI, the parties' Motions for Summary Judgment focus almost entirely on Mr. Garcia's federal

claim.  Both the Berks Officers and PrimeCare argue that they did not act with deliberate

indifference toward Mr. Garcia's serious medical needs.  In addition, the Berks Officers contend

that Mr. Garcia failed to exhaust his administrative remedies as against them before bringing his

Section 1983 lawsuit.  The Court will address each party's contentions in turn.


        A.      The Berks Officers

        The Prison Litigation Reform Act ("PLRA") mandates that an inmate must exhaust a

prison facility's administrative remedies before bringing a suit concerning prison conditions

11

pursuant to Section 1983.  See 42 U.S.C. § 1997e(a).  "To properly exhaust administrative remedies, an inmate must appeal a grievance through all administrative levels of appeal at the inmate's institution."  Miller v. DiGuglielmo, No. 07-2686, 2010 WL 4909589, at *10 n.7 (E.D. Pa. Nov. 30, 2010) (quotation omitted).  "Failure to exhaust is an affirmative defense to be pled and proven by the defendant."  Harper v. Albo, No. 10-7555, 2011 WL 3740815, at *5 (E.D. Pa. Aug. 24, 2011) (citing Ray v. Kertes, 285 F.3d 287, 291 (3d Cir. 2002)).[10]

The Berks Officers argue that Mr. Garcia did not exhaust his administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA") before filing suit, and that, therefore, the Court should grant summary judgment in their favor.  Mr. Garcia concedes that he did not exhaust the Berks County Prison's administrative process by filing an inmate grievance form, or even a sick call or inmate communication form complaining about the sutures in his head or his lack of treatment for them.  However, Mr. Garcia contends that the Court must excuse his failure to exhaust because the Berks Officers denied him access to these forms, rendering the prison's administrative process unavailable to him.

"The PLRA does not require exhaustion of all remedies . . . . [R]ather, it requires exhaustion of such administrative remedies 'as are available.'"  Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (citing 42 U.S.C. § 1997e(a)).  "'Available' means 'capable of use; at hand.'"  Id. at 113.  When prison officials thwart an inmate's attempts to utilize his administrative remedies, those remedies are "unavailable" for exhaustion purposes.  See id.; see also Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) (noting that a denial of access to grievance forms can

---

[10] Only the Berks Officers raised failure to exhaust as an affirmative defense in their answer to Mr. Garcia's Amended Complaint.

render the administrative remedies unavailable).  The availability of administrative remedies to a

prisoner is a question of law for the Court to decide.  Daniels v. Rosenberger, 386 F. App'x 27,

29 (3d Cir. 2010) (citing Kertes, 285 F.3d at 291).

Here, the record simply does not support Mr. Garcia's assertion that the administrative

process was "unavailable" to him during the relevant period.  Mr. Garcia raises two primary

arguments to support his claim that the Berks Officers rendered administrative remedies

unavailable, relying solely on his own self-serving deposition testimony in the face of

overwhelming evidence to the contrary.[11]  First, Mr. Garcia testified, in conclusory fashion, that

he asked Officers Schell, Kern, and Cooper for inmate grievance forms "all the time" to address

his inadequate medical care, but his requests were denied.  Garcia Dep. 164:8-25.  This one

generalized snippet of deposition testimony, combined with the fact that he did not file an inmate

grievance form during the relevant time period, is the only "evidence" supporting his claim that

he was denied access to the inmate grievance process.

The record is clear, however, that inmate grievance forms are not the exclusive way for

inmates to complain about prison treatment, and that a prisoner may use either an inmate

grievance form or an inmate communication form to file a grievance.  Section 9.1 of the Berks

County Prison Inmate Handbook provides that inmates "may submit a written request (using an

Inmate Communication Form) to staff other than those assigned to work directly in your housing

unit," and if the inmate feels a significant complaint has not been resolved by this process, he

---

[11] While the Court is not permitted to weigh the evidence presented or make credibility
determinations at summary judgment, the Court need only make *reasonable* inferences in favor
of the non-moving party and must deny a motion for summary judgment only where *genuine*
factual disputes exist.  See Butler Cty., 418 F.3d at 267.

may file a grievance.  Pl. Ex. M at 31.  Thus, the filing of an inmate communication form is an available, though not required, first step toward resolving an inmate's complaint.

Additionally, the Officers testified that a grievance is equally valid if made via an inmate communication form as if it had been made with a grievance form.  See Castro Dep. 41-42 ("What they do is take the regular communication form and write the word "grievance" at the top, and then it becomes a valid – it becomes a valid form for using as a grievance as well."); Hitchens Dep. 34-36 ("Even if there is no grievance forms, the inmate just takes an inmate communication and states a complaint, and it it's valid, they investigate it.  I am not aware of a complaint being filed on an improper form would strike out as grievance on that type of technicality, they are just processed."); 79-80 ("[I]f they want to [file a grievance] they just – they file it on the slip, on the form, one form or another.  I mean, if they handed in a piece of paper, to my knowledge, and state a valid grievance, that's processed.  If they put it on a communication form, that's valid and it goes through the process.").[12]  During the relevant time frame, Mr. Garcia filed fourteen (14) separate inmate communication or discipline appeal forms detailing various complaints such as problems with other inmates, disagreements with correctional officers, religious classification concerns, and requests to have people added to his visitors' list.[13]

_____

[12] Also, although Officer Cooper passed away before the Plaintiff had an opportunity to depose him, both Officers Schell and Kern testified that they had very limited recollection of Mr. Garcia, but that whenever an inmate wants to file a grievance, "standard procedure" was to "give him a grievance form and tell [the prisoner] to fill it out," and the Officers "always just give [inmates] the form."  Schell Dep. 40:6-10, 50:2-20; Kern Dep. 29:13-30:5, 32:3-10.

[13] These inmate communication forms were filed on August 22, 2006, August 27, 2006, August 28, 2006, August 30, 2006, August 31, 2006, September 3, 2006, September 12, 2006, September 19, 2006, September 27, 2006, October 3, 2006, October 3, 2006, October 18, 2006, November 14, 2006, and December 16, 2006.  Berks Ex. N.

<u>See</u> Def. Ex. N.  However, on none of these forms did Mr. Garcia complain about the failure to

remove his sutures or anything of that sort.

Finally, Mr. Garcia also argues that pursuant to Section 9.3.6 of the Inmate Handbook,

prisoners are restricted to addressing only one single incident per grievance form, and thus he

could not add a complaint about the sutures when lodging his grievance about exercise yard

access.  PCMF-B ¶ 31.  Mr. Garcia filed his one inmate grievance form on August 14, 2012

before the ten-day period for removal of his sutures had expired, and consequently, he had no

reason to complain about his medical care at that time.  All of his inmate communication forms,

on the other hand, were filed after the ten-day period had ended.  Given the volume of inmate

communication forms he filed, no reasonable jury could conclude that the restriction of one

incident per form in any way deprived Mr. Garcia to access to the administrative process.[14]

---

[14] Mr. Garcia also testified that the Berks Officers ignored his repeated verbal requests to provide him with sick call forms to get medical attention for his sutures.  Garcia Dep. 110-111. However, contrary to Mr. Garcia's testimony, the record is clear that Mr. Garcia submitted three (3) sick call forms between August 6, 2006 and December 6, 2006, none of which mentioned the removal of his sutures.  Def. Ex. I, 601-03.  All three of Mr. Garcia's sick call forms related to a toothache, all of them were filed after August 16, 2006 (when the sutures were supposed to be removed), and two of these forms were filed on the same day, October 3, 2006.  That Mr. Garcia filed two sick call forms on the same day, but opted to request medical assistance about the same non-suture-related issue on both of them instead of using one to request assistance with his sutures, suggests that the sick call forms were not as hard to come by as Mr. Garcia submits.

Likewise, Mr. Garcia repeatedly contradicted his own claim that the sick call forms were unavailable to him.  On the one hand, he testified that he was repeatedly denied sick call forms by the Berks Officers and that he did not make any sick call requests prior to his first sick call request on September 9, 2006.  Garcia Dep. 110, 114.  On the other hand, he testified that the reason he did not mention his sutures in the sick call forms he did file was that PrimeCare "wasn't answering [his] other sick call slips about his headaches."  <u>Id</u>. at 105.  Such inconsistencies and contradictions permeate Mr. Garcia's testimony.

Exhaustion is a question of law to be decided by the Court.  See Rosenberger, 386 F. App'x at 29.  Here, although Mr. Garcia testified in general terms that three Berks Officers denied him access to the administrative process, all of the other evidence in the record suggests otherwise.  Other than Mr. Garcia's conclusory and self-serving deposition testimony, he has failed to provide any evidence from which a reasonable jury could conclude that the Berks Officers obstructed his ability to utilize the prison's administrative process related to his allegedly inadequate medical care.  Because the Court cannot conclude that the administrative process was unavailable to Mr. Garcia, it declines to reach the merits of his Section 1983 claim against the Berks Officers, and grants summary judgment in favor of the Berks Officers.

### B.     PrimeCare, Inc.

PrimeCare argues that Mr. Garcia fails to specify evidence that raises a genuine issue of material fact for trial on his Section 1983 claim.  To survive summary judgment on a claim under 42 U.S.C. § 1983, "a plaintiff must show that the defendant, acting under color of state law, deprived [the plaintiff] of a right secured by the Constitution or laws of the United States." Hojnowski v. Primecare Medical, No. 06-1228, 2009 WL 1175611, at *4 (E.D. Pa. Apr. 30, 2009) (citing Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)).[15]  When evaluating a § 1983 claim, the Court must first "identify the exact contours of the underlying right said to have been violated" so as to determine if Mr. Garcia has set forth evidence establishing a deprivation of a constitutional right at all.  See Natale v. Camden Cty. Corr. Facility, 318 F.3d

---

[15] It is undisputed that PrimeCare acted under color of state law for the purposes of this motion.  Thus, the analysis for Mr. Garcia's § 1983 claim centers on whether PrimeCare violated the constitutional right of Mr. Garcia to receive adequate medical care while in prison.

575, 581 (3d Cir. 2003).  If the plaintiff establishes an underlying violation of his rights, the

Court then must determine whether the state actor, in this case PrimeCare, can be held liable for

that violation.  See Berg v. County of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000).

### 1.       Violation of Mr. Garcia's constitutional rights

PrimeCare contends that Mr. Garcia fails to raise a genuine issue of material fact as to

whether its medical employees were deliberately indifferent to Mr. Garcia's medical needs such

that they violated his constitutional right to adequate medical treatment.  A § 1983 claim based

on the failure to provide adequate medical treatment generally arises under the Eighth

Amendment and occurs when prison officials exhibit (1) deliberate indifference (2) to a

prisoner's serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  However, at the

time of the events in question, Mr. Garcia was a pretrial detainee.  Unlike with convicted

prisoners, the constitutional standard governing a prison's treatment of a pretrial detainee is

governed by the Due Process clause of the Fourteenth Amendment.[16]   Hubbard v. Taylor, 399

F.3d 150, 165-66 (3d Cir. 2005); see City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239,

244 (1983) ("Because there had been no formal adjudication of guilt . . . at the time he required

medical care, the Eighth Amendment has no application.").

Although neither the Supreme Court nor the Third Circuit Court of Appeals have yet to

define the exact contours of either a state or federal pretrial detainee's Due Process right to

---

[16] The Due Process inquiry for pretrial detainees is whether the treatment "amounted to punishment prior to an adjudication of guilt, or whether [the] treatment was, instead, merely an incident of some other legitimate governmental purpose."  Morgan-Mapp v. George W. Hill Corr. Facility, No. 07-2949, 2008 WL 4211699, at *13 (E.D. Pa. Sept. 12, 2008) (citing Hubbard, 399 F.3d at 158-59).

medical treatment, it has been established that "the Eighth Amendment informs, but does not control, the analysis as to pretrial detainees[']" claims related to deficient medical treatment. Morgan-Mapp, 2008 WL 4211699, at *13 (citing Hubbard, 399 F.3d at 166; Kost v. Kozakiewicz, 1 F.3d 176, 188 n.10 (3d Cir.1993)); see also Bell v. Wolfish, 441 U.S. 520 (1979).  In other words, the Eighth Amendment standard sets a "floor," below which the medical treatment of pretrial detainees may not fall.  Hubbard, 399 F.3d at 165-66.

    "Under the Eighth Amendment, deliberate indifference to a serious medical need is a subjective standard, requiring a defendant to have *actual knowledge* of [a convicted] inmate's serious medical needs."  Morgan-Mapp, 2008 WL 4211699, at *13 (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)) (emphasis added).  However, "deliberate indifference to a *pretrial detainee's* right to receive care" under Due Process is a somewhat lower standard, "similar to recklessness."  Hojnowski, 2009 WL 1175611, at *4 (emphasis added).  Under either version of deliberate indifference, "mere negligence or inadvertence in failing to provide adequate medical care" will not support a § 1983 claim.  Id.  Deliberate indifference has been found where there was "objective evidence that [a] plaintiff had serious need for medical care," and prison officials ignored that evidence, see Nicini v. Morra, 212 F.3d 798, 815 n.14 (3d Cir. 2000), and where "necessary medical treatment is delayed for non-medical reasons."  Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).

    Sufficient evidence exists in the record here to create a genuine issue of material fact as to whether PrimeCare employees were deliberately indifferent to Mr. Garcia's serious medical

needs.[17]  In conjunction with his discharge from Reading Hospital following his arrest, the hospital issued written instructions that Mr. Garcia's sutures should be removed no later than August 16, 2006, or ten days from the date of his discharge.  See PCMF-B ¶¶ 7, 10-11, Exs. D, E, I.  Upon Mr. Garcia's arrival at the Berks County Prison on August 6, 2006, PrimeCare staff evaluated the discharge instructions and Reading Hospital's written instructions and included them in Mr. Garcia's medical charts.  See PCMF-P ¶ 26.  Mr. Kirsch examined and evaluated Mr. Garcia two days later.  See id. ¶¶ 27-32.  During his examination, Mr. Kirsch made note of Mr. Garcia's sutures in his medical charts and entered a medical order for their removal on August 11, 2006.  Id.  Both Drs. Wilson and Von Kiel reviewed and approved of Mr. Kirsch's examination.  See id.

To ensure that the order for suture removal would be carried out, PrimeCare personnel testified that it should have been entered on a facility-wide calendar or "provider line" for August 11, 2006.  Shelton Dep. 48-50, 54; Kirsch Dep. 67-68.  However, it is undisputed that Mr. Kirsch's order for suture removal was never entered on the "provider line" for August 11, 2006, his follow up appointment was never scheduled, and the August 11 follow-up appointment did not occur.  See PCMF-P ¶¶ 37-38.  The sutures were not removed until December 5, 2006, almost four months after they were supposed to be removed.  Id. at 38-39.

---

[17] PrimeCare does not dispute for the purposes of this motion that the timely removal of the sutures in Mr. Garcia's head constituted a "serious medical need."

19

Mr. Garcia testified that he wore the same dressings continuously for this same period.[18]
Garcia Dep. 158:8-19.  Likewise, between August 11 and December 5, 2006, PrimeCare staff
saw Mr. Garcia on multiple occasions for numerous unrelated medical issues.[19]  Id. at 40.  A
reasonable jury could infer that the PrimeCare personnel who saw Mr. Garcia were acting
deliberately indifferent to Mr. Garcia by failing to inquire about his bandages.  Although
PrimeCare points to Mr. Garcia's other medical appointments as evidence that it was not
deliberately indifferent to his medical needs, that PrimeCare saw Mr. Garcia on so many
occasions with his head dressings, presumably looked at his medical chart containing the order
for removal of his sutures each time, and treated everything *other than* his sutures, a reasonable
jury could find that PrimeCare personnel acted with deliberate indifference toward Mr. Garcia's
medical needs.

Moreover, Mr. Kirsch testified that prisoners are not responsible for ensuring that they
receive follow-up care that has been ordered for them and they are not told for what date the
treatment has been ordered.  Id. at 42, Ex. B.  Nevertheless, Mr. Garcia testified that, on at least

---

[18] Despite Mr. Garcia's testimony, both his medical records and the testimony of Mr.
Kirsch indicate that his dressings were changed.  PrimeCare Ex. Q; Kirsch Dep. 162:12-17.
However, there is no evidence in the record that contradicts Mr. Garcia's testimony that he wore
at least *some* dressings on his head during this period.  Garcia Dep. 78:6-9; 135:10-24.

[19] During the relevant period, PrimeCare saw Mr. Garcia on August 8, 2006, August 9,
2006, September 20, 2006, October 11, 2006, November 13, 2006, and December 5, 2006.
PrimeCare Ex. B.  Likewise, while Mr. Garcia was relegated to segregated housing, Mr. Garcia
was seen by PrimeCare staff on at least 31 separate occasions during segregation rounds.
PrimeCare Ex. F.  Following the removal of his sutures, PrimeCare saw Mr. Garcia on January 3,
2007, January 5, 2007, January 12, 2007, February 6, 2007, February 13, 2007, and March 23,
2007.  PrimeCare Ex. B.

one occasion, he requested that a PrimeCare doctor remove his sutures and the doctor directly

rebuffed his request and "kicked [him] out" of his office.  Id. at 42.

PrimeCare has not presented any evidence establishing that its failure to attend to Mr.

Garcia was pursuant to its medical judgment.  In fact, numerous PrimeCare employees have

testified that sutures of the kind that were implanted in Mr. Garcia's head should not remain in

place for as long as they did, and the failure to timely remove sutures risked infection and

exacerbated scarring.  Id. at 46-52.

Mr. Garcia has provided sufficient evidence to survive a motion for summary judgment

on the question of whether PrimeCare employees violated Mr. Garcia's Fourteenth Amendment

right to adequate medical care while in state custody.

### 2.    Liability of PrimeCare for violation of Mr. Garcia's constitutional right

While issues of material fact exist as to whether PrimeCare employees violated Mr.

Garcia's constitutional rights, pursuant to Monell v. Dep't of Social Servs., 436 U.S. 658 (1978),

private medical contractors like PrimeCare cannot be held liable under § 1983 for the actions of

their employees under the theory of respondeat superior.  See Afdahl v. Cancellieri, 463 F. App'x

104, 109 (3d Cir. 2012) (noting that as it pertains to prison healthcare contractors, "liability under

§ 1983 cannot be based solely upon the doctrine of respondeat superior") (citing Natale, 318 F.3d

at 583); see also Reichart v. Prison Health Servs., SCI-Camp Hill, No. 11-1992, 2012 WL

2411838, at *4 (M.D. Pa. June 26, 2012) (same).  Instead, to survive a motion for summary

judgment, Mr. Garcia must demonstrate that PrimeCare had an established policy, practice, or custom that caused the alleged constitutional violation at issue.  See Natale, 318 F.3d at 583-84.

A policy exists where "a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict," Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (citation omitted), whereas a custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bd. of Cty. Comm'rs. of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997).  A policy or custom may exist where "the policymaker has failed to act affirmatively at all, though the need to take some action . . .  is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." Natale, 318 F.3d at 584.

Here, Mr. Garcia has presented no evidence that PrimeCare had an affirmative policy or custom that caused the constitutional violation here.  Rather, he asserts that PrimeCare ignored an obviously inadequate practice and failed to implement appropriate procedures that likely would have prevented the violation in the first instance.

It is undisputed that in 2006, PrimeCare did not have a formal policy, procedure, or protocol for creating, managing, communicating and carrying out medical orders such as Mr. Kirsch's suture removal order for Mr. Garcia.  See PCMF-P ¶¶ 67-70.  PrimeCare personnel testified that they ensure such orders are processed by having nurses transfer orders to the "provider list' or calendar whenever the doctors apply a "tag" to the appropriate page of the patient's chart.  PCMF-P ¶ 69; Shelton Dep. 51-52.  However, in response to an interrogatory,

PrimeCare directly contradicted this testimony by noting, "[A]s a general rule, the only 'tabs' placed in inmate files are to separate types of information not to designate individual pages."  Pl. Ex. E, Response 3.

Equally absent from the record is any indication that PrimeCare had an adequate procedure for flagging and redressing missed administrations of medical treatment.  Mr. Kirsch testified that PrimeCare patients are not responsible for ensuring that they receive the follow-up care that has been ordered for them.  PCMF-P ¶ 43.  Indeed, patients are not told when their follow-up treatment will occur.  Id.  Dr. Von Kiel testified that, as PrimeCare's medical director, if a patient's follow-up appointment was missed, he would normally inquire as to why it was missed.  Id. ¶ 82.  However, neither Dr. Von Kiel, nor Dr. Wilson, nor Mr. Kirsch could recall investigating the reason why Mr. Garcia's appointment was missed.  Id. ¶¶ 80-87.  This is hardly surprising, considering that Mr. Garcia's suture removal appointment was never actually scheduled.

Finally, Mr. Garcia has also presented evidence that PrimeCare management failed to enforce the one method that was available for tracking whether its patients' problems had been resolved.  On the top page of each patient's file, PrimeCare maintains a "Master Problem List," which highlights any outstanding medical problems the patient may have and whether the problems have been resolved.  See id. ¶¶ 71-72.  Mr. Garcia's "Master Problem List" includes an instruction for suture wound care.  Pl. Ex. V.  PrimeCare medical staff saw Mr. Garcia on multiple occasions for numerous unrelated medical issues during the relevant period, and each time they opened his file, presumably, they could see this notation on Mr. Garcia's Master

Problem List.   PCMF-P ¶ 40.  However, not one of the PrimeCare staff or treating physicians did anything to remedy the situation.

Moreover, each Master Problem List contained a column entitled "date resolved" which was intended to indicate when and if a particular medical need of a prisoner was resolved. However, Mr. Kirsch testified, "Honestly, I never write that [an issue has been resolved] on the problem list.  I know there is section there called day resolved.  I have never seen any of our providers write it under there," other than in limited circumstances.  Kirsch Dep. 127-128.  The "date resolved" section on Mr. Garcia's Master Problems List was empty.  See id. ¶¶ 73-74.  Had PrimeCare medical providers followed this possible technique for tracking patient follow-up care, perhaps the absence of any notation under the "date resolved" column would have alerted one of Mr. Garcia's subsequent treating physicians that he had an outstanding medical need.

Viewing the facts in the light most favorable to Mr. Garcia and making every reasonable inference in his favor, a reasonable jury could conclude that the failure to establish any formal policy to ensure that (1) medical orders were processed and executed or that (2) missed appointments were rescheduled, constituted deliberate indifference to a known or obvious risk, i.e., that orders for follow-up care would go unprocessed and unnoticed, and that patients' serious medical needs would go untreated.  A reasonable jury could also infer that PrimeCare's failure to establish a more responsive policy, or, even to utilize the "master problems list," caused the specific constitutional violation of which the Mr. Garcia complains.  See Bryan County, 520 U.S. at 404 (holding the Plaintiff must establish "a direct causal link between the municipal action and the deprivation of federal rights").

24

Accordingly, the Court finds that summary judgment in favor of PrimeCare is not warranted.[20]

**V.     CONCLUSION**

For the foregoing reasons, the Court grants summary judgment with respect to the Berks Officers, and denies summary judgment with respect to PrimeCare, Inc.

An appropriate Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[20] Because the Court denies PrimeCare's motion for summary judgment as to Mr. Garcia's federal claim, and PrimeCare only seeks dismissal of Counts II through VI on the grounds that the Court would lack independent subject matter jurisdiction over the state law claims if it did dismiss the federal claim, the Court denies PrimeCare's motion with respect to Counts II through VI as well.